IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 17, 2017 Session

## STATE OF TENNESSEE v. JERICA ELIZABETH TAYLOR

**Appeal from the Criminal Court for Davidson County**
**No. 2015-B-937   Cheryl Blackburn, Judge**

_____

### No. M2016-02578-CCA-R3-CD

_____

The Defendant, Jerica Elizabeth Taylor, was convicted by a Davidson County Criminal Court jury of aggravated robbery, a Class B felony. *See* T.C.A. § 39-13-402 (2014). The trial court sentenced the Defendant as a Range I, standard offender to eleven years' confinement at 85% service. On appeal, the Defendant contends that (1) the evidence is insufficient to support her conviction, (2) the trial court improperly limited her cross-examination of the victim, (3) the photograph lineup was improperly admitted as evidence, and (4) the trial court erred during sentencing. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Anne M. Davenport, Nashville, Tennessee, for the appellant, Jerica Elizabeth Taylor.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Glenn Funk, District Attorney General; and Megan King, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the December 14, 2014 robbery of William Majano. At the trial, the victim, a native of El Salvador, testified with the aid of a certified court interpreter that he had lived in Davidson County for eleven or twelve years. The victim said that he had known the Defendant as Jessica and for about three months at the time of the robbery. He said that they met in September 2014, when the Defendant offered him roadside assistance when his truck tire "blew up." The victim said that they "hit it off," that they talked for a few minutes, and that he gave her his cell phone number when she asked for it. The victim said that the Defendant called him about four days later, that he picked up the Defendant at a location she

determined, that they engaged in sexual intercourse, and that he drove the Defendant to her sister's apartment. The victim said that although the Defendant never asked for money, he gave her $50 cash because she stated she needed money for her young child. He said that they met two weeks later, that they engaged in sexual intercourse, and that he gave her money, although she never stated she was a prostitute.

The victim testified that on December 14, 2014, the Defendant sent him a text message requesting a ride and that he picked her up at an apartment complex around 2:30 or 3:00 p.m. He said that the victim was alone in a parking lot and that she told him to park his truck. He said that she entered the truck, that he asked her where she wanted to go, and that she told him to wait before she turned off the truck's engine. He said he became nervous because her hands trembled as she sent a text message. The victim said that after the Defendant sent the text message, two men, whom the victim had never seen, walked toward his truck, stopped, looked at him, walked around two cars in the parking lot, and walked to the rear of his truck. The victim identified codefendant James Leggett as one of the men. The victim said that codefendant Leggett and the other man approached the driver's door, that the victim opened the door, and that the men blocked the door. The victim said that the man with codefendant Leggett pointed a gun, which touched the victim's stomach. The victim said that the man pointing the gun stood about one foot away from him and that the man was about five feet tall. The victim said that codefendant Leggett searched the truck's center console and took the victim's GPS device.

The victim testified that the Defendant searched the glove box as codefendant Leggett searched the center console and that the other man continued pointing the gun at the victim. The victim said he later determined that his debit card was taken from the glove box. He said that the gun was pointed at him during the entire incident and that he did not recall the Defendant and the men talking. He said that eventually, the two men left but that the Defendant continued searching his truck. The victim thought the robbery lasted five minutes. He said that before the men left, a white truck drove by, that he raised his hands "so they could see me," and that the two men left. The victim said that the Defendant had his belongings, that he grabbed and pushed her, and that she dropped the items. The victim said that the two men saw him push her and that the man holding the gun fired it twice at the victim. The victim was not injured, and the Defendant ran away.

The victim testified that his cell phone, debit card, and GPS device were taken during the robbery. He said that the man holding the gun removed the victim's cell phone from the victim's jacket pocket. The victim said he never gave the Defendant permission to take his debit card. He said that he grabbed his belongings and left and that he used the Defendant's cell phone, which she left behind when she ran, to send a text message to his phone telling "them" to return his belongings. He said that he left the scene because of his "nerves" but that he returned about ten minutes later because he thought the Defendant would return his

cell phone. He said that when he returned, people who lived nearby were talking on the phone to the police. He said that he spoke to the police on the phone and that he left the scene again because he did not want any problems and wanted to leave. He said he was scared the Defendant and the men would retaliate against him. He said that as he drove away, he saw a police car, that he turned around and stopped his truck, and that he told the police officer what occurred.

The victim testified that he provided the police with descriptions of the men, that he identified the Defendant from a photograph on the Defendant's cell phone, and that he gave the phone to the police officers. He said that the officers took him to a nearby area for a showup identification but that the men the police had detained were not the men from the robbery. He said that hours later, the police showed him photograph lineups and that he identified the Defendant and Xavier McDonald as the man holding the gun. The victim said that he was certain the Defendant robbed him. The victim said that he was shown two photograph lineups from which he identified nobody. The victim said that on December 16, he identified codefendant Leggett from a photograph lineup. The victim said he was certain codefendant Leggett robbed him. The victim agreed he had previously identified the Defendant and codefendant Leggett at the preliminary hearing on February 13, 2015. The victim said that the police recovered and returned his debit card but that his GPS device and cell phone were never returned.

The victim testified that codefendant Leggett's previous attorney approached him before a January 22, 2015 court hearing, that the attorney showed him a photograph, and that he later learned the photograph was of Ivan Johnson. The victim said that Mr. Johnson was one of the men in the police showup identification a few hours after the robbery but that Mr. Johnson was not one of the men involved in the robbery. The victim said that Mr. Johnson's photograph was included in one of the photograph lineups presented by the police. The victim said the attorney was aggressive, made declarations that Mr. Johnson was one of the men who robbed him, and did not ask him questions. The victim said that the conversation occurred in a small room inside the courthouse, that he did not want to talk to the attorney, and that he told the attorney what the attorney wanted to hear in order for the attorney to allow him to leave the room. The victim said that an interpreter arrived after he and the attorney began speaking and that he later told the interpreter that Mr. Johnson did not rob him.

The victim testified that the Defendant initiated the December 14, 2014 contact with him by sending him a text message requesting he "come over" because she wanted to have sexual relations. The victim said he responded that he was at work but sent a message to the Defendant when he left work asking for her location. The victim said that the Defendant provided the address. The messages were received as an exhibit and reflected that the victim's cell phone received the message containing the address at 3:03 p.m. The victim said

that he arrived at the address about fifteen minutes later, and the text message records reflected that a message threatening to call the police was sent from the Defendant's cell phone to the victim's cell phone at 3:30 p.m. The victim identified photographs of the handgun the man pointed at his stomach and of his cell phone taken during the robbery.

On cross-examination, the victim testified that before the trial, nobody asked whether he and the Defendant had a sexual relationship. He denied that they had sexual relations each time they met. He described the places where they had sexual relations and said afterward, he drove the Defendant to the Defendant's sister's home. He said they did not have an agreement that he would pay the Defendant for sex. He said he gave the Defendant money because she said she needed money for her child. He said that he drove her to the places she needed to go because he thought she was a good person. He said that although they had sexual relations, he had no obligation to the Defendant and that the Defendant always sent him text messages when she wanted to meet.

The victim testified that although he did not see the Defendant or the two men take his GPS device, he knew it was taken by one of them. He said that he did not watch all three of them the entire time because a handgun was pointed at and pushed into his stomach. He agreed that before the robbery, he was not afraid of the Defendant and said that he had driven her twice previously without incident. He did not recall talking to the Defendant on the telephone the day of the robbery, but he agreed records showed ten calls between them. He said that the Defendant stood alone outside the apartment complex when he arrived and that he never saw the Defendant with the two men before the robbery.

The victim testified that codefendant Leggett's previous attorney aggressively pushed Mr. Johnson's photograph in the victim's face and that the victim told the attorney what the attorney wanted to hear in order to be able to leave the room. The victim said he had never testified that Mr. Johnson was the person who robbed him.

Xena Olvera testified that she lived at the apartment complex where the robbery occurred and that she called the police at approximately 3:30 p.m. She said that she was driving home, that she saw the victim wave his hands, and that she saw another man walk through her lawn. She said that she saw another man on the "other side" of the parking lot and that she thought a carjacking occurred. She said that, in addition to the victim, she saw three people and heard two gunshots, that the victim left the area but returned, that she called 9-1-1, and that her brother and mother spoke to the victim. Ms. Olvera said that she heard what the victim said to her mother and brother and that she relayed the information to the 9-1-1 dispatcher. She said that the 9-1-1 call was placed approximately ten to fifteen minutes after the robbery and that the victim was scared. Ms. Olvera said that she overheard the victim say he had been robbed, "they" took his money and had a gun, two men and one woman were involved, he gave the woman a ride, and the woman told him where to park his

-4-

truck. Ms. Olvera said that the victim left in his truck, that she obtained the truck's license plate information, and that she provided it to the 9-1-1 dispatcher.

Ms. Olvera testified that she provided the 9-1-1 dispatcher with a description of the clothes worn by the two men and the woman she saw in the parking lot. Ms. Olvera did not see their faces and could not identify them but said all three people were African-American. Ms. Olvera said that she saw the woman standing at the victim's truck's passenger-side door with the door open and that the woman wore a "purple pinkish sweater."

On cross-examination, Ms. Olvera testified that the two men she saw were suspicious because she had never seen them previously and because they were walking in her lawn. She had also never seen the victim's truck before this incident.

Metropolitan Nashville Police Officer Thomas Barnes testified that he responded to the scene, that he saw the victim's truck, and that he initiated a traffic stop to ensure the victim's safety based upon the report of gunshots. Officer Barnes said that the victim was scared and extremely nervous but that the victim was cooperative and gave a statement about the robbery and a description of the men and woman, whom the victim identified as "Jessica." Officer Barnes said that the victim provided him a cell phone, that the phone rang while they talked, that a photograph of a woman appeared on the screen, and that the victim identified the woman as Jessica. Officer Barnes identified the Defendant as Jessica and said the victim stated the phone was left behind when the Defendant ran.

Officer Barnes testified that the victim agreed to view a showup identification near the scene approximately one hour after the robbery. Officer Barnes said that he pointed toward two men who stood on the porch of a nearby townhome and that the victim said the men were not involved in the robbery. Officer Barnes noted that "people kind of come and go" from the townhome. He said that he saw the Defendant at the townhome, that he asked if her phone was missing, and that she appeared shocked and "baffled around a little bit . . . kind of suspicious." Officer Barnes said that he returned to where the victim's truck was parked, that he attempted to obtain fingerprints from the truck, and that he focused mostly on the passenger door, based upon the victim's statement, in an effort to identify the Defendant. Officer Barnes said that he successfully obtained a fingerprint from the cell phone the victim provided.

Officer Barnes testified that one or two weeks after the robbery, he responded to the scene after he received a report of a damaged vehicle in the parking lot and that the vehicle had a single gunshot marking on the hood. He said that when he went to the townhome where he saw the Defendant on the night of the shooting, the owner would not allow him past the doorway. He said that he saw a cell phone inside a cat litter box, that he thought it might have been the victim's cell phone, and that he did not confiscate the phone. He said

he returned to the townhome the day after the robbery, but nobody answered the door. Officer Barnes said he attempted to speak with the owner several times.

Metropolitan Nashville Police Officer Linda Wilson, an expert in latent fingerprint examination, testified that a fingerprint obtained from the passenger-side door handle was compared with the known fingerprints of the Defendant, codefendant Leggett, Ivan Johnson, Taylor Johnson, Tashay Dupree, and Xavier McDonald. She determined that the fingerprint from the victim's truck did not match the known fingerprints of any of these people. She said that other fingerprints obtained at the scene were of poor quality and could not be used for comparison. She explained that some surfaces might not hold fingerprints and that environmental conditions could impact a fingerprint left on a surface. She said that the lack of a fingerprint on a surface did not imply that a person had or had not touched an object. She determined that the fingerprint obtained from the cell phone was of no comparison value.

Metropolitan Nashville Police Sergeant Michelle Jones testified that she spoke to the victim on the night of the robbery and that the victim was calm and cooperative but frightened and "shaken up." She said that the victim provided the cell phone that was left behind by the woman involved in the robbery, that the phone rang during the police investigation, and that after the ringing stopped, a photograph of the Defendant appeared on the phone.

Sergeant Jones testified that she went to the townhome where two men, Taylor Johnson and Ivan Johnson, had been before the men participated in a showup identification but that the victim did not identify either man as one of the robbers. Sergeant Jones said that the owner of the townhome allowed the police inside and that the Defendant, Tashay Dupree, Taylor and Ivan Johnson, and Xavier McDonald were inside. Sergeant Jones said that inside the townhome, the owner drew her attention to a debit card lying on the dining table and that it was later determined that the card belonged to the victim. Sergeant Jones said that Mr. McDonald, who was also known as "Elk," was found hiding in a bathroom closet. A photograph of the bathroom showed a cat litter box containing a cell phone.

Metropolitan Nashville Police Detective Jeffrey Jobe testified that he met with the victim approximately eight hours after the robbery and that based upon their conversation, he prepared four photograph lineups for the victim to review. Detective Jobe said the lineups were centered around the people who were at the townhome on the night of the robbery, including the Defendant, Ivan and Taylor Johnson, and Xavier McDonald. Detective Jobe said that he told the victim to identify anyone who looked familiar. Detective Jobe said that within seconds the victim identified the Defendant as Jessica and reported she took his belongings and debit card. Detective Jobe said the Defendant wore a "purplish" sweater on the night of the robbery.

-6-

Detective Jobe testified that the victim also identified Xavier McDonald from a photograph lineup, that the victim said Mr. McDonald was the person who pointed and pushed the gun into the victim's stomach, and that the victim identified Mr. McDonald within seconds. Detective Jobe said that the victim did not identify Ivan or Taylor Johnson as being involved in the robbery. Detective Jobe said that later, he showed the victim an additional photograph lineup and that the victim identified codefendant Leggett as the man who went inside the victim's truck during the robbery. Detective Jobe said that he obtained a search warrant to examine the cell phone the victim provided Officer Barnes and requested codefendant Leggett's and the victim's cell phone records.

On cross-examination, Detective Jobe testified that on April 16, 2015, he met with the owner of the townhome and that he showed the owner the photograph lineup containing codefendant Leggett's photograph. Detective Jobe said that on March 16, 2016, he spoke with Ivan and Taylor Johnson and that he showed them the photograph lineup containing codefendant Leggett's photograph.

Metropolitan Nashville Police Detective Chad Gish, an expert in digital forensic analysis, testified that then-retired Detective Jeff Weaver analyzed the cell phone obtained from the victim on the night of the robbery. He said that the data extraction report showed that the Text Free Ulta application had been downloaded and that the user name on the account was the Defendant's first name. He said that the phone was linked to an email address containing the Defendant's first and last names. Detective Gish said that the Kik application had been downloaded to the phone and that the email account connected to the application contained the Defendant's first and last name. He said that the Instagram application had been downloaded and that the name registered with the application was the Defendant's first name. Detective Gish said that the Google Plus application, which he explained was similar to Facebook, had been downloaded, that the account name was the Defendant's first and last names, and that the application linked to the email address containing the Defendant's first and last names. Detective Gish said that additional Google-related and Facebook Messenger applications on the phone were linked to the same email account.

Detective Gish testified that messages exchanged through the Facebook Messenger application were recovered from the cell phone. He said that the extraction report showed that the phone was used to exchange messages with "Joshua MBA Taylor" on December 14, 2014. Detective Gish identified three photographs extracted from the phone, and each depicted an African-American woman. He said that two photographs were taken by the phone's camera but that the metadata did not reflect whether the third photograph was taken by the phone or another device.

Detective Gish testified that text messages were exchanged between the cell phone analyzed and the victim's cell phone, and the report showing messages from December 11, 2014, to December 14, 2014, was received as an exhibit. The report showed that the victim's cell phone sent text messages on December 14 to the phone analyzed. The phone analyzed showed the victim's cell phone number corresponded to the contact name of "$$$$$." The victim's cell phone sent a message to the phone analyzed at 2:01 p.m., which stated, "Where U. At." At 2:55 p.m., the phone analyzed sent a message to the victim's cell phone directing the victim to put the address where the robbery occurred into his GPS device. At 3:30, the phone analyzed sent a message to the victim's cell phone stating, "Ok. I. Call. Police. I'm here." Telephone calls between the victim's cell phone and the phone analyzed reflected ten calls on December 14, and Detective Gish said that the call placed to the victim's cell phone at 2:45 p.m. was the only call long enough to support a conclusion that a conversation occurred.

Detective Gish testified that he isolated communications on the cell phone analyzed with the contact name "Elk." The phone analyzed contained fifty-six text messages between December 12, 2014, and December 14, 2014. The report reflected that the phone analyzed sent Elk two messages on December 14, at 3:21 p.m., which stated, "Come on" and "Hurry."

Detective Gish testified that on December 10, 2014, the cell phone analyzed sent six text messages to six contacts providing a "new" cell phone number. On December 11, the phone analyzed sent a message to a seventh contact stating, "Hey this Jerica i got a new number wyd u at work?" Detective Gish said that he did not find any data on the phone analyzed showing communications with the contact name Ivan Johnson or with the cell phone number linked to Mr. Johnson.

On cross-examination, Detective Gish testified that the extraction report showed that only ten telephone calls were placed between the cell phone analyzed and the victim's cell phone and that all the calls were placed on the same day. He said the report showed that the first text message between the phone analyzed and the victim's phone occurred on November 30, 2014.

Assistant District Public Defender Brian Griffith testified on behalf of codefendant Leggett that he represented codefendant Leggett for a short time before Mr. Griffith joined the Public Defender's Office. Mr. Griffith stated that on January 22, 2015, he spoke to the victim inside a small room at the courthouse. Mr. Griffith said that he showed the victim a photograph depicting Ivan Johnson and asked the victim if Mr. Johnson had been involved in the robbery and that the victim stated Mr. Johnson had been involved. Mr. Griffith said that Christina Frasier, an interpreter, entered the room and offered assistance, and the victim stated again that Mr. Johnson was involved in the robbery. Mr. Griffith said that he placed the photograph on the table and denied that he put it in the victim's face. Mr. Griffith said

that the conversation lasted one to one and one-half minutes and that he stood approximately two to three feet from the victim. Mr. Griffith denied that he prevented the victim from leaving the room and said that he identified himself as codefendant Leggett's attorney and asked if the victim would speak to him.

On cross-examination, Mr. Griffith testified that the victim identified codefendant Leggett near the time of the offense as one of men involved in the robbery. Mr. Griffith also knew that the victim identified codefendant Leggett again at a December 19, 2014 court hearing. Mr. Griffith denied that the victim did not want to speak with Mr. Griffith on the day they spoke at the courthouse. Mr. Griffith agreed he did not tell the victim that he was recording the conversation. Mr. Griffith said that at the time he spoke to the victim, he did not know the victim had viewed a photograph lineup containing Ivan Johnson's photograph and that the victim had said nobody in the lineup was involved in the robbery.

As rebuttal evidence, Christina Frasier, a certified court interpreter, testified for the State that she interpreted the victim's testimony at a January 22, 2015 court hearing. She said that before the hearing, she saw Mr. Griffith approach the victim and leave the courtroom. She said that she wanted to offer interpreting assistance for the victim, that she left the courtroom, and that she saw the victim and Mr. Griffith in a conference room outside the courtroom. She said that she knocked on the door, that she identified herself in English and in Spanish, and that she offered to help the men communicate. She said that the victim was short and that Mr. Griffith was "very tall and big build" and could "be a little intimidating just physically." Ms. Frasier said that the victim looked scared, confused, and "intimidated by the situation." She said that the victim recounted the robbery, that Mr. Griffith showed the victim a photograph, and that, in her opinion, Mr. Griffith purposefully and insistently tried to get the victim to state that the man in the photograph was involved in the robbery.

Ms. Frasier testified that it was not apparent Mr. Griffith recorded the conversation. She said that after she and the victim left the room, the victim stated that codefendant Leggett was involved in the robbery, not the man in the photograph. She said that the victim was upset and that when the victim saw codefendant Leggett in the courtroom, the victim immediately stated that the man in the photograph was not involved in the robbery.

On cross-examination, Ms. Frasier testified that Mr. Griffith welcomed her to join them in the conference room. She clarified that Mr. Griffith's size was not the only intimidating factor during the conversation. She said that although the victim could speak some English, the courtroom environment and the different and unknown terminology made the victim uncomfortable. She recalled that the victim had been unsure whether he was permitted to speak with Mr. Griffith. She thought the conversation lasted fifteen minutes.

Ms. Frasier testified that she would have been surprised if the recording reflected that Mr. Griffith only asked the victim twice whether the man in the photograph was involved in the robbery. She said that although she knew the recording was about two minutes, the conversation was definitely much longer because the victim "repeat[ed] the story a couple of times."

Upon this evidence, the jury found the Defendant guilty of aggravated robbery. The court sentenced her to eleven years' confinement at 85% service. This appeal followed.

## I.     Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support her conviction. She argues that no evidence showed she possessed a weapon, she knew Mr. McDonald or anyone would bring a gun to the victim's truck, and she communicated with codefendant Leggett. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Aggravated robbery is defined, in relevant part, as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," which is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" T.C.A. §§ 39-13-401(a) (2014), -402(a)(1). "A person is criminally responsible for the offense committed by the conduct of another, if . . . [a]cting with the intent to promote or assist the commission of the offense, or

to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id*. § 39-11-402(2) (2014). "All who are present at the commission of a robbery, rendering it countenance and encouragement, ready to assist should the necessity arise, are liable as principal actors." *State v. Maxwell*, 441 S.W.2d 503, 504 (Tenn. Crim. App. 1969). Criminal responsibility is warranted if a defendant "was present, aiding and abetting, or ready and willing to aid if necessary" during the offense. *Id.* A defendant "need not have taken any money from [a] victim with his own hands, or actually participated in any other act of force or violence" to be criminally responsible for robbery. *Id.*

In the light most favorable to the State, the evidence shows that on the day of the robbery, the Defendant sent the victim a text message asking him to pick her up. The victim contacted the Defendant after his work shift ended, and the Defendant provided the victim with the address of her location, which was an apartment complex. When the victim arrived, the Defendant told the victim where to park, entered the truck, and turned off the truck's engine. The victim saw the Defendant's hands shaking as she sent a text message, and codefendant Leggett and Mr. McDonald approached the victim's truck from behind. The men blocked the victim's ability to leave his truck, and Mr. McDonald pointed a gun at the victim, placed the gun on the victim's stomach, and removed the victim's cell phone from his jacket pocket. Codefendant Leggett searched the center console of the truck near the GPS device, and the Defendant searched the glove box where the victim kept his debit card. The victim's GPS device, cell phone, and debit card were taken without the victim's consent. After the men walked away from the truck, the Defendant continued searching the glove box, and the victim grabbed and pushed the Defendant because she had the victim's belongings, which fell on the ground. The Defendant's cell phone was also left behind. Mr. McDonald saw the push and fired the gun twice at the victim.

The victim identified the Defendant from a photograph that appeared on the Defendant's cell phone when the victim was talking to the police and said the Defendant was one of the people who took his belongings. The victim also identified the Defendant from a photograph lineup and during the trial. The victim sent the Defendant a text message at 2:01 p.m., asking where to pick her up, and he arrived at the address she provided at approximately 3:15 p.m. At 3:21 p.m., the Defendant sent Mr. McDonald messages telling him to come on and to hurry.

Shortly after the robbery occurred, police officers responded to the scene and spoke to the owner of a nearby townhome. Officer Barnes testified that the Defendant was at the townhome, that he asked if her cell phone were missing, and that the Defendant "baffled around" and acted suspiciously. Officer Jones testified that several people were at the townhome after the robbery, including the Defendant and Mr. McDonald. Officer Jones found the victim's debit card inside the townhome.

This evidence supports a finding that the Defendant was a principal actor in the aggravated robbery. The Defendant lured the victim to the scene and sent text messages to Mr. McDonald, who pointed and fired the gun at the victim. The Defendant turned off the truck's engine and told the victim to wait. This provided sufficient time for Mr. McDonald and codefendant Leggett to arrive. The victim's stolen debit card was found at the nearby townhome, where the Defendant and Mr. McDonald were found after the robbery. The Defendant's participation in the robbery is sufficient to impose criminal liability. Her assertion that she did not know Mr. McDonald would bring a gun to the robbery is not determinative because she actively participated in the robbery. The Defendant was not required to use force or violence against the victim in order for her to be criminally responsible for aggravated robbery. *See Maxwell*, 441 S.W.2d at 504. The evidence is sufficient to support the Defendant's conviction for aggravated robbery. She is not entitled to relief on this basis.

## II. Limiting Cross-Examination of the Victim

The Defendant contends that the trial court improperly limited her cross-examination of the victim. She argues that the court should have permitted her to question the victim about his "prior criminal history of patronizing prostitution," his immigration status, and about the Defendant's age and "juvenile status." The State responds that the court exercised proper discretion in limiting the defense's cross-examination. We agree with the State.

"[C]ross-examination is a fundamental right." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). "[A] denial of the right to an effective cross-examination is 'constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial.'" *Id.* (quoting *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). "The propriety, scope, manner, and control of cross-examination of witnesses, however, remain within the discretion of the trial court." *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012).

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403. Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

Tennessee Rule of Evidence 608(b) states, in relevant part, that

[s]pecific instances of conduct of a witness for the purpose of attacking . . . the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness. . . . The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

(1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry; [and]

(2) the conduct must have occurred no more than ten years before commencement of the action or prosecution[.]

By contrast, Rule 609 permits the use of previous convictions to impeach a witness's credibility so long as the crime was punishable by death or imprisonment of more than one year or the crime involved dishonesty or false statements. Tenn. R. Evid. 609(a)(2).

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a person acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id*.; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). The standard of review is for an abuse of discretion, provided a trial court substantially complied with the procedural requirements. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998).

## A.      Victim's History of Patronizing Prostitution and Immigration Status

The record reflects that before the trial, the State filed a motion requesting that the Defendant be required to request a jury-out hearing in order for the trial court to determine the admissibility of any criminal behavior or prior bad acts of the victim, including the victim's immigration status, pursuant to Tennessee Rules of Evidence 404(b), 608, and 609. The record contains neither a transcript from the motion hearing nor an order resolving the motion relative to the victim's immigration status or his alleged previous history of patronizing prostitution. However, an exchange between the trial judge and trial counsel

during the trial reflects that before the trial, the trial court excluded evidence of the victim's patronizing prostitution and his immigration status.

At the trial, trial counsel asked the victim, "[Y]ou know it's illegal to pay for sex in the State of Tennessee?" The trial judge interrupted and demanded a bench conference. The judge stated, "I thought I told you that you're not going to get into something that may be a crime. Did you not hear that clearly? . . . You just asked the question, don't you know that it's a crime. I specifically said you were not going to do that." Counsel denied violating the court's order but argued that the victim testified on the previous day that he left the crime scene because he was nervous. The following exchange then occurred:

> [Counsel]: I believe he was leaving because he –
>
> The Court: I don't care what you believe, [counsel]. You're not to ask that question. They're to disregard it. You can argue things, but you're not going to ask the question isn't it a crime. I don't know how many times we went over this.
>
> [Counsel]: Your Honor, I have to say that I do not – I remember you saying –
>
> The Court: No, you cannot ask somebody. It's called 404.
>
> [Codefendant Leggett's Counsel]: Can I –
>
> The Court: No, you can't. You're not in this conversation.
>
> [Codefendant Leggett's Counsel]: Okay.
>
> [Counsel]: Your Honor –
>
> The Court: No.
>
> [Counsel]: I just want the Court to understand that I was not trying to disregard your instructions. What I understood that the Court was saying is that we could not produce evidence of a prior conviction under 404.
>
> The Court: No. I said over and over – you have just asked a 404B question, didn't you know this was a crime. That's called prior bad acts. I told you [that] you could get into the acts, but you couldn't mention accusing him of a crime. No, that was really clear.

-14-

. . .

Now, the other thing I want you to be doing is when you don't like the answer to the questions take that face off of you. It's a scowl that you're making in front of the jury. You're rolling your eyes and all that. Stop that. Because that is your comment on his testimony, and it's inappropriate.

Now where are you going with this? Because I'm not going to let you ask that question about the crime.

[Counsel]: About the illegal activity?

The Court: Yes.

[Counsel]: Because I believe that's why he wanted to leave from there aside from the immigration issue, which I know we're not going to talk about at all.

The Court: And you're not going to talk about the criminal behavior.

[Counsel]: Let me finish explaining for the record.

The trial court excused the jury from the courtroom for a jury-out hearing. The trial judge stated that she had made clear that trial counsel could cross-examine the victim about the relationship of the parties, establish that a relationship existed, and establish that the victim paid the Defendant for sex, but that counsel could not ask about the victim's committing a crime or about his immigration status. The judge said that counsel's question was a direct violation of the court's pretrial ruling and that counsel's question attempted to elicit a response involving propensity evidence of the victim. The judge said that counsel wanted to prove the Defendant and the victim had a relationship before the robbery and that the victim had never told the police about the relationship, and that this topic was for impeachment. The court forbade counsel from asking the victim about any crime.

The defense was permitted to make an offer of proof. The victim stated that on December 14, 2014, he knew paying for sexual relations was illegal. He denied, though, that his leaving the scene and not wanting to speak to police were related to his knowledge that prostitution is illegal. The victim said that he did not want to "do all this that I'm doing here." He said that he did not tell the police about his relationship with the Defendant because he did not have to tell the police about his private life and that he did not hide

anything from the police. He said that he told the police he was picking up the Defendant. The victim said that he did not pick up the victim to pay her for sexual relations but agreed that paying for sexual relations was not something he would want to share with the police. He denied previously paying the victim for sexual relations and said that he "just [gave] her money" and that they never reached an agreement about money. The victim testified that, previously, he had been issued a citation for patronizing prostitution.

The trial court repeated its determination that trial counsel was prohibited from asking the victim about any crime or knowing it was illegal to pay for sexual relations pursuant to Tennessee Rule of Evidence 404. The court, likewise, prohibited counsel from questioning the victim about his previous arrest or conviction for patronizing prostitution pursuant to Tennessee Rules of Evidence 608 and 609. The court determined that the offense was a misdemeanor and was irrelevant to the victim's credibility. The court determined that counsel could ask the victim whether he was untruthful to the police about his and the Defendant's relationship and whether he attempted to hide the relationship.

On appeal, the Defendant argues that the victim's previous criminal citation for patronizing prostitution was relevant to the victim's credibility. She asserts that the victim agreed to meet the Defendant on the day of the robbery to have sex with her in exchange for money and that the arrangement was a reason to avoid police contact. She argues that the jury should have been aware that the Defendant was engaged in criminal activity at the time of the robbery.

The record reflects that during the offer of proof, the victim testified that the police issued a criminal citation to the victim for patronizing prostitution and that he was not formally arrested. The record does not include documentation showing that the victim was convicted of patronizing prostitution, and at oral argument, trial counsel conceded that the victim paid court costs and that the case was dismissed. In any event, even if the victim were previously convicted of patronizing prostitution, it would have been a misdemeanor and not admissible for impeachment purposes. *See* Tenn. Rule Evid. 609; *see also* T.C.A. § 39-13-512(3) (2014) (patronizing prostitution), -514(b)(1) (2014) (stating patronizing prostitution is a Class B misdemeanor). Likewise, if the victim were not convicted of patronizing prostitution, such conduct is not probative of truthfulness or untruthfulness. *See State v. Ford*, 861 S.W.2d 846, 849 (Tenn. Crim. App. 1992) (concluding that "[s]pecific instances of sexual conduct are not probative of truthfulness or untruthfulness"); *State v. Jackson*, 697 S.W.2d 366, 371 (Tenn. Crim. App. 1985) (concluding that questions relative to a witness's sexual partners are not probative of truthfulness for impeachment purposes). We note that in her appellate brief and at oral argument, the Defendant concedes that Tennessee Rule of Evidence 404 related to prior bad acts does not provide an avenue by which evidence of the victim's patronizing prostitution would have been admissible. Evidence that the Defendant

and the victim had a sexual relationship and that the victim paid the Defendant money, although the victim disputed he paid the Defendant for sexual relations, was before the jury. The jury was permitted to credit the victim's testimony or to believe trial counsel's theory that the victim paid the Defendant for sexual relations. We conclude that the trial court did not abuse its discretion, and the Defendant is not entitled to relief on this basis.

Relative to the victim's immigration status, the trial court reaffirmed, during the jury-out hearing, its previous ruling excluding evidence that the victim was in the country unlawfully because it had no relevance to the victim's truthfulness or untruthfulness. However, the court provided the defense with the opportunity to make an offer of proof relative to how the victim obtained the debit card issued by a banking institution. The victim stated that on December 14, 2014, he was in the country unlawfully and that he had been in the United States for about eleven years. He denied that his immigration status caused him to avoid contact with the police and noted that he had previously received a citation for having no driver's license, that he went to court to resolve the matter, and that no problems arose with his immigration status. He denied he left the scene of the robbery because of his immigration status. The victim agreed the stolen debit card was issued after he opened a checking account in his name. He could not recall what documentation he provided to the bank in order to open the account but thought he might have provided his passport and the number issued to him by the Internal Revenue Service for tax purposes. He denied that the bank asked whether he was a United States citizen and said that the bank told him an account could be opened with his passport.

The trial court determined that questions related to the bank account and the debit card were inadmissible because no proof showed that the victim made misrepresentations to the bank when he opened his account. The court found that the victim's immigration status was irrelevant and that even if relevant, the evidence was "far more prejudicial than probative."

On appeal, the Defendant argues that the victim's immigration status was relevant to his "credibility as a witness in view of his flight from the scene where shots had been fired." She argues that the victim was not fully cooperative and withheld information from the police about his sexual relationship with the Defendant. Likewise, she argues that because the victim fled the scene and did not want to talk to the police, she should have been permitted to question the victim about his immigration status.

The record reflects that the Defendant's arguments that the victim was not cooperative and withheld information from the police about his relationship with the victim are, at best, mischaracterizations of the evidence. At the trial, the victim testified that he left the scene because of his "nerves" but that he returned to the scene. The victim said that he did not want any problems, wanted to the leave the scene, feared retaliation from the Defendant and

her companions, and did not want to be involved in a lengthy trial process. The victim never testified that he intentionally failed to disclose his sexual relationship with the Defendant to the police. Rather, the testimony reflects that nobody asked the victim about his relationship with the Defendant before the trial. Furthermore, the police officers testified that the victim was cooperative with the investigation, although he was nervous and scared, and remained at the scene for an extended time. During the offer of proof, the victim testified that he did not fear the police because of his immigration status and noted that he had previously received a traffic citation and resolved the matter without impacting his immigration status. Furthermore, the victim's testimony during the offer of proof did not show he made any false statements or misrepresentations to the bank when he obtained his debit card from the bank. Nothing in the record reflects that the victim's actions on the night of the robbery were influenced by his immigration status.

The record supports the trial court's determination the victim never made false statements or misrepresentations about his immigration status to anyone. Therefore, the victim's immigration status had no relevance to the victim's credibility. *See* Tenn. R. Evid. 608(b). Likewise, the record does not reflect that the victim had been convicted of a crime relative to his immigration status. *See* Tenn. R. Evid. 609. Most important, though, is that the victim's immigration status was generally irrelevant to the facts at issue during the trial. *See* Tenn. R. Evid. 401, 402. Whether the victim was inside this country lawfully or unlawfully had no bearing on whether a crime occurred, whether the Defendant was involved in a crime, and whether the victim could identify the Defendant as one of the perpetrators. *See State v. Mark A. Crites*, No. M2014-00383-CCA-R3-CD, 2015 WL 3508042, at *8 (Tenn. Crim. App. June 4, 2015) (concluding that a victim's immigration status is not relevant to showing whether a crime occurred), *perm. app. denied* (Tenn. Sept. 17, 2015). Furthermore, the evidence could have only served to confuse the issues for the jury's determination and to inflame any prejudice against unlawful immigration. *See* Tenn. R. Evid. 403. The trial court did not abuse its discretion by excluding evidence of the victim's immigration status, and the Defendant is not entitled to relief on this basis.

## B.      Defendant's Age and Juvenile Status

The record reflects that the State also filed a pretrial motion pursuant to Tennessee Rule of Evidence 401 to preclude the defense from presenting evidence that the Defendant was a juvenile at the time of the offense, that her case was transferred from juvenile court, or that she was a minor at the time she had sexual relations with the victim. The Defendant's written response argued that the relationship between the Defendant and the victim was relevant to the victim's credibility and admissible pursuant to Tennessee Rules of Evidence 401 and 402. The Defendant's response stated that the she had a right to present evidence of the victim's prior inconsistent statements concerning the relationship.

Although no trial court order resolving the motion is included in the appellate record, the record contains a subsequent defense motion that states the court had excluded evidence of the Defendant's age. The record reflects that more than one pretrial hearing occurred in this case and that trial counsel was absent from at least one hearing involving a motion filed by codefendant Leggett's trial counsel. The record contains the transcript from only one pretrial hearing. At this hearing, the parties discussed the Defendant's motion to continue the trial date. The court mentioned codefendant Leggett's trial counsel's motion in which counsel wanted "to call the alleged victim a pedophile." The trial judge stated the following:

> I don't know why [codefendant Leggett's counsel] thought that was admissible, but I declined to allow that. I said there can be discussion obviously between your client and the alleged victim about their relationship. Age is not going to come in, nor anything that reflects on bad character. That would be also – if he's trying to show the bad character, it implicates your client, too. So her age is not going to come in front of the Court.

The court acknowledged that the Defendant's trial counsel was not present at this hearing. Counsel told the court that the victim testified at the juvenile court transfer hearing and that he was dishonest about the nature of his relationship with the Defendant. The court repeated for counsel that evidence of the relationship was admissible but that age was inadmissible. Counsel stated that the victim testified at the transfer hearing that he was age thirty-one and that he believed the Defendant was age nineteen. Counsel said that she believed the reason the victim did not want to divulge the nature of his and the Defendant's relationship was because he knew the Defendant was a minor. Counsel believed that the victim was attempting to "cover up the situation" and that the jury should be permitted to consider this evidence. Counsel denied her motive was to present evidence of the Defendant's age in order to obtain sympathy from the jury. Counsel said the evidence was relevant to the victim's credibility. The trial court instructed counsel as follows:

> Well, let me be a little clearer then. You're not going to ask that question without me allowing it to come in without some reasonable basis for the question. And you've not provided – nobody has provided to me a copy of the testimony at the Juvenile Court or why that would be relevant. That would be the subject of testimony. That has not been done. [Codefendant Leggett's trial counsel] admitted to me in court the other day on Wednesday that he wanted to convince the jury that the man was a pedophile. [Codefendant Leggett's trial counsel] actually said that was the whole purpose of what he was going to do, that was the character. It went to his credibility. And that kind of character evidence is not coming in front of this jury.

Counsel said she understood the court's ruling and stated that she had a copy of the transfer hearing transcript.

The defense made an offer of proof relative to the Defendant's age. The victim stated that he did not know the Defendant was underage at the time of the robbery and that as a result, he could not have been concerned about telling the police about his sexual relationship with the Defendant. He said, though, that at the time of the juvenile court transfer hearing, he knew the victim was a minor. He said that initially nobody had explained to him that a person the victim's age who engaged in sexual relations with a minor had committed a felony but that he understood this at the time of his trial testimony.

The trial court determined that questions related to the victim's engaging in a sexual relationship with a minor were "more prejudicial than probative" and that the evidence was inadmissible.

On appeal, the Defendant argues that the victim's engaging in sexual relations with a minor was relevant to the victim's credibility about his "account of what occurred and his description of the Defendant's role." She asserts that the victim's conduct with a minor "may have" motivated the victim to "cast blame upon her to distract from his criminal conduct."

The record reflects that the Defendant alleged at the pretrial hearing that the victim testified untruthfully at the juvenile court transfer hearing relative to the Defendant's age. We note that the trial judge stated at the pretrial hearing that neither party had provided her with a transcript of the juvenile court hearing. The record does not reflect that the trial court received the juvenile court transfer hearing transcript. We also note that the transcript is not included in the appellate record. Therefore, the record does not reflect what the victim stated during his juvenile court hearing testimony and does not support the allegation that the victim provided false or misleading testimony. In any event, the trial court permitted the defense to question the victim about the nature of the relationship, and the victim admitted he had a sexual relationship with the Defendant and that money exchanged hands, although its purpose was disputed. However, during the offer of proof, the victim stated that at the time of the offense, he did not know the victim was a minor, although he knew the Defendant's juvenile status at the time of the transfer hearing.

Evidence that the victim could have known the Defendant was a minor at the time they were engaging in sexual relations had minimal relevance to the victim's credibility, to the extent it showed the victim had a motivation to incriminate the Defendant falsely. *See* Tenn. R. Evid. 401, 402. However, the victim testified during the offer of proof that he did not learn the Defendant was a minor until after the robbery, and no evidence in the record

before this court suggests otherwise. Furthermore, the victim stated that because he did not know the Defendant's juvenile status, he could not have feared prosecution. Trial counsel stated during oral argument that the Defendant was a victim of a crime because she engaged in sexual acts with the Defendant at a time when she was a minor and that the jury should have been made aware of this fact. However, the present trial involved the Defendant's alleged criminal wrongdoing, not the victim's alleged wrongdoing. Whether intentional or unintentional, evidence of the Defendant's age could have inflamed the jurors' emotions in such a manner to prejudice the jury against the State, preventing it from rendering its verdict based upon evidence related to the aggravated robbery. *See* Tenn. R. Evid. 403. We conclude that the trial court did not err by determining that any probative value of the Defendant's age was substantially outweighed by the danger of unfair prejudice. The Defendant is not entitled to relief on this basis.

### III.    Admissibility of the Photograph Lineup

The Defendant contends that the trial court erred by admitting in evidence the photograph lineup containing her photograph. She argues that her photograph included in the lineup was a "mug[shot]," which revealed her previous "contact" with the police and that as a result, the lineup should have been excluded pursuant to Tennessee Rules of Evidence 403 and 404.

The record reflects that the Defendant filed a pretrial motion to preclude the State from introducing the photograph lineup from which the victim identified her. The motion stated that a mugshot photograph was used in the lineup, that the photograph was not required for the victim to identify the Defendant at the trial, and that the photograph unduly prejudiced the defense pursuant to Tennessee Rule of Evidence 403. *See* Tenn. R. Evid. 403. However, the record contains only one transcript from a pretrial motion hearing, and although the transcript reflects that numerous State and defense motions were addressed, it does not reflect that the defense's motion relative to the photograph lineup was addressed. Likewise, the record does not contain a trial court order resolving the motion, and nothing in the trial transcript sheds light on what occurred during the motion hearing. The issue was later raised in the Defendant's motion for a new trial. However, the transcript of the motion for a new trial hearing reflects that trial counsel did not address each allegation specifically, and the trial court stated relative to the photograph lineup that it relied on its previous rulings and determinations.

The Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g.*, *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983). This included the obligation to have a transcript of the evidence or proceedings prepared. *See* T.R.A.P. 24(b). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded

from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). The Defendant has failed to prepare an adequate record, and she is not entitled to relief on this basis.

## IV. Sentencing

The Defendant contends that the trial court erred during sentencing. She argues that the court erred by permitting Officer Daniel Polk to testify about her previous juvenile delinquency determination and a pending criminal court matter. She also argues that the court erred by imposing a sentence above the "presumptive" minimum sentence of eight years. The State responds that the trial court did not abuse its discretion. We agree with the State.

At the sentencing hearing, the Defendant's juvenile record was received as an exhibit and reflected that the Defendant was adjudicated delinquent of conspiracy to commit aggravated robbery. The record reflected that the Defendant had pending criminal court charges of aggravated robbery and theft of a vehicle valued at $10,000 or more but less than $60,000.

The presentence report was received as an exhibit and reflected that the Defendant was age eighteen and had one son. She reported completing the tenth grade but not graduating from high school because of her incarceration in this case. The Defendant reported that she began using cocaine and marijuana in 2014 but that she no longer used drugs. The Defendant reported that she was an "occasional drinker" but that she no longer drank alcohol. She reported good mental health and stated she took medication for depression. She reported previous employment in the fast food industry and obtaining an internship with the Urban League of Tennessee.

Nashville Police Officer Daniel Polk testified that the Defendant was a suspect in a December 13, 2014 aggravated robbery. Officer Polk stated that he went to the victim's home to investigate and that the victim said the Defendant was his former girlfriend. Officer Polk said the victim reported that the Defendant knocked on his door and that three unknown men entered the apartment, one of whom struck him in the head with a handgun. Officer Polk stated that cash and PlayStation and Wii gaming systems were stolen. Officer Polk said the victim identified the Defendant from a photograph lineup.

Officer Polk testified that he investigated a 2013 aggravated robbery and that the

Defendant admitted guilt and was adjudicated delinquent of conspiracy to commit aggravated robbery in juvenile court in connection with the robbery. Officer Polk stated that he responded to a shooting and that a man had been shot outside of a "town home [sic] complex." Officer Polk said that another officer went to the complex and that the officer found a woman, who had been shot, lying on the ground. Officer Polk said that the officer saw the Defendant near the scene, that the Defendant told the officer the woman was her friend, and that the woman "was running and just fell." Officer Polk said the police determined that the woman had been lying there for about thirty minutes and that no one called for an ambulance.

Officer Polk testified that he took the Defendant and four men to the police station for questioning and that the Defendant said she knew the man who had been shot. Officer Polk stated that the Defendant said she had met the victim on the Internet, that she and the woman who had been shot both went on dates with him, and that the victim did not know the Defendant was underage. Officer Polk stated that the Defendant said she knew the victim carried cash and usually carried a gun.

Officer Polk testified that the Defendant went on a date with the victim the night he was shot, that she sent a text message to a group of men throughout the night to inform them of the pair's location, and that the male victim drove her back to the apartment complex. Officer Polk said that after the Defendant and the victim arrived, the Defendant got out of the car and that the woman who had been shot and the group of men "rushed the car to rob [the victim]." Officer Polk stated the Defendant said that the group of men shot at the car, that a bullet struck the victim, and that the woman was shot in the neck.

On cross-examination, Officer Polk testified that the Defendant did not possess a gun during the two robberies he investigated. Upon questioning by the trial court, Officer Polk testified that the woman was in the car with the group of men and was shot accidentally when walking toward the complex with the Defendant.

Elizabeth Jones, the Defendant's success coach, testified that she met the Defendant in May of 2016. Ms. Jones said that the Defendant joined her "program," which helped individuals achieve life goals. Ms. Jones said the Defendant completed the GED program, was "put through a paid work experience," and received housing through the program. Ms. Jones stated that the Defendant received counseling for childhood trauma and that the Defendant "really wanted to change . . . [and] was really looking for help." Ms. Jones said that the program age group was seventeen to twenty-four and that the Defendant could only remain in the program if she reentered before age twenty-four.

The Defendant made an allocution to the trial court expressing her remorse for hurting the victim. She said that she had childhood issues and that incarceration at age sixteen had changed her life. The Defendant stated that she wanted to be a good mother and that she did not want to be away from her son. The Defendant said that she entered the "Chapter 2 program," that she found steady employment, and that she received counseling. She stated that since being incarcerated, she had enrolled in a domestic violence program and parenting and victim impact classes and had been baptized. The Defendant asked the court for leniency and to consider her age at the time of the offense.

The trial court considered the evidence presented at the trial and the sentencing hearing, the presentence report, the principles of sentencing, the arguments regarding sentencing alternatives, the nature and characteristics of the criminal conduct, the mitigating and enhancement factors, and the Defendant's allocution. The court found that mitigating factor (6) applied because the Defendant was age sixteen when she committed the offense but that the factor did not carry "much weight at all." *See* T.C.A. § 40-35-113(6) (2014) ("The defendant, because of youth or old age, lacked substantial judgment in committing the offense[.]").

The trial court found that enhancement factor (1) applied because the Defendant had been adjudicated delinquent previously and had participated in criminal acts. *See id*. § 40-35-114(1) (2014) (amended 2015, 2016, 2017) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court applied enhancement factor (2) because the Defendant contacted the victim initially and told her codefendant when to arrive by text message. *See id*. § 40-35-114(2) ("The defendant was a leader in the commission of an offense involving two (2) or more criminal actors[.]"). The court found that enhancement factor (8) applied because the Defendant failed to comply with probation conditions. *See id*. § 40-35-114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]"). The court applied enhancement factor (13) because the Defendant was on probation in juvenile court at the time she committed the present offense. *See id*. § 40-35-114(13) ("At the time the felony was committed . . . the defendant . . . [was] released on probation [.]"). The found that enhancement factor (16) applied because the Defendant had committed a delinquent act as a juvenile that would have constituted a felony if committed as an adult. *See id*. § 40-35-114(16) ("The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult[.]").

The trial court found that the present offense was serious and that the Defendant's criminal conduct led to Mr. McDonald's death. The record reflects that Mr. McDonald sustained fatal gunshot wounds when the police attempted to apprehend him in this case. The court found that the Defendant was a Range I offender and imposed an eleven-year

sentence to be served at 85%.

## A. Officer Testimony

We consider, first, the Defendant's argument that the trial court erred by permitting Officer Polk to testify about her previous juvenile delinquency adjudications, and we conclude that the testimony was proper. Tennessee Code Annotated section 40-35-209(b) states, in relevant part:

> At the sentencing hearing, the court shall afford the parties the opportunity to be heard and present evidence relevant to the sentencing of the defendant . . . . The rules of evidence shall apply, except that reliable hearsay, including, but not limited to, certified copies of convictions or documents, may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted[.]

Officer Polk's testimony regarding the Defendant's criminal history was reliable based upon his investigation and was relevant to the court's sentencing determinations. The record reflects that the Defendant cross-examined Officer Polk and was afforded an opportunity to rebut the evidence. The court properly admitted the evidence, and the Defendant is not entitled to relief on this basis.

## B. Length of Sentence

Turning to the Defendant's allegation that her sentence is excessive, this court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our

Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

Tennessee Code Annotated section 40-35-210(c) (2014) states that although the court is required to impose a within-range sentence, the court is not bound by the advisory sentencing guidelines, including the guideline that the minimum sentence within the range is the sentence that should be imposed. *See* T.C.A. § 40-35-210(c)(1) (2014). Additionally, the court has discretion to adjust the sentence within the range "as appropriate, by the presence or absence of mitigating and enhancement factors[.]" *Id*. § 40-35-210(c)(2).

We conclude that the trial court did not abuse its discretion and that the court properly applied the principles and purposes of sentencing. The record reflects the trial court considered the applicable enhancement factors and placed little weight on the applicable mitigating factor. The court's application of enhancement factors (1) and (16) is supported by the record. The Defendant had previously been adjudicated delinquent for conspiracy to commit aggravated robbery and had two pending charges in criminal court at the time of sentencing. Likewise, the court did not abuse its discretion in applying enhancement factors (8) and (14) because the Defendant had previously violated probation and did not adhere to her conditions of release. Finally, the record supports the court's applying enhancement factor (2). The evidence shows that the Defendant initiated contact with the victim and asked him to meet her at a designated location and that the Defendant communicated with Mr. McDonald to determine when the robbery should occur. We note that the Defendant does not challenge the court's application of the enhancement factors. The sentencing range for a Range I, standard offender convicted of aggravated robbery is eight to twelve years, and the Defendant received a within-range sentence of eleven years' incarceration. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's conviction.

 

 

 

_____
ROBERT H. MONTGOMERY, JR., JUDGE